UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

```
_____
                                    )
SECURITIES AND EXCHANGE COMMISSION, )
                                    )
            Plaintiff,              )
                                    )
            v.                      )      CIVIL ACTION
                                    )      NO. 11-11576-WGY
EAGLEEYE ASSET MANAGEMENT, LLC,     )
and JEFFREY A. LISKOV,              )
                                    )
            Defendants.             )
_____ )
```

MEMORANDUM

YOUNG, D.J.                                    October 4, 2013

## I.  INTRODUCTION

This case illustrates the value of a jury trial in an adjudicatory system apparently devoted almost entirely to efficiency. Its broad outlines are briefly limned. The well-prepared plaintiff brought a motion for summary judgment. Its outcome was all but a foregone conclusion and it was supported by a decision in this district in closely analogous circumstances. This Court denied summary judgment. A costly and inefficient (at least compared to summary judgment) nine-day jury trial ensued. The jury returned a carefully nuanced verdict that necessarily addressed and resolved an issue that transcends in significance the dispute between these particular

parties.   I would argue that this is the proper procedural

course.[1]   Others may disagree.[2]   The facts speak for themselves.

---

[1] I have long argued that the federal judiciary's single minded emphasis on efficiency tends to marginalize the American Jury, supplant other, more important values, and that more comprehensive measures of district court activity are needed today.  See United States v. Massachusetts, 781 F. Supp 2d 1, 23-25 (D. Mass. 2011) (citing Patrick E. Higginbotham, The Present Plight of the United States District Courts, 60 Duke L.J. 745, 747 (2010)); see also Leonard Post, Federal Tort Trials Continue a Downward Spiral, Nat'l L.J., Aug. 22, 2005; Patrick E. Higginbotham, Judge Robert A. Ainsworth, Jr. Memorial Lecture, Loyola University School of Law: So Why Do We Call Them Trial Courts?, 55 S.M.U. L. Rev. 1405, 1405-06 (2002)).  It is for this reason that I have, for the past four years, published a ranking of America's most productive federal district courts.  See William G. Young & Jordan M. Singer, Bench Presence: Toward a More Complete Model of Federal District Court Productivity, 118 Penn St. L. Rev. (forthcoming Fall 2013), available at http://ssrn.com/abstract=2246875.  I am not alone in these concerns.  See Joseph F. Anderson, Jr., Where Have You Gone, Spot Mozingo? A Trial Judge's Lament Over the Demise of the Civil Jury Trial, 4 Fed. Cts. L. Rev. 99, 105 (2010);  Victor E. Schwartz & Leah Lorber, A Letter to the Nation's Trial Judges: How the Focus on Efficiency Is Hurting You and Innocent Victims in Asbestos Liability Cases, 24 Am. J. Trial Advoc. 247, 249 (2000).

The irony here is that the new palaces of steel and glass [courthouses] arrive at the point where the courts actually empty out in favor of the devolution of adjudicative function to the bureaucratic back offices. The courtrooms have the transparency of the void, while the offices thrum and vibrate to the energies of privatized Justice -- the antidemocracy of multiple forms of Alternative Dispute Resolution where only the protagonists engage while the public is shut out. In a parallel development, increasing concerns with security engender both barriers to participation in standard courts and special courts, such as in Guantanamo, that denigrate completely the notion of public participation and with it the safeguards to justice that such participation developed to ensure. Such courts are the particularly sharp edge of less

visible but cognate domestic processes, both criminal
and civil, which close off avenues to public
participation (for example, commercial contracts that
include terms requiring that disputes be resolved by
private arbitration). Only in certain enlightened
spaces is there sign of the successful blending of
image and process, marked by the recognition of the
violence of judgment, but also, in balance, the price
paid in suffering for the possibility of this
democratic form of violence to have been achieved and
thus a constant reminder of the possibilities of
injustice . . . . The danger is that such rare
examples of "iconography for democratic adjudication"
become lost in the welter of self-congratulatory
edifices to transparency that provide a front
operation to the back-housing of adjudication-as-
administration.

Eugene McNamee, Review of Judith Resnik & Dennis Curtis,
Representing Justice: Invention, Controversy, and Rights in
City-States and Democratic Courtrooms, 25 Law & Literature
131, 137 (2013).

It need not be this way. "[T]he jury is worth
fighting for." Jennifer Walker Elrod, Is the Jury Still
Out?: A Case for the Continued Viability of the American
Jury, 44 Tex. Tech. L. Rev. 303, 303 (2012).

Judge D. Brock Hornby recently and provocatively
pondered how a reality television show might depict a
federal trial court judge today. He envisioned that
the judge would be in an office in business attire,
spending most of her time pounding away on a keyboard.
His vision suggested a person tethered to the computer
and all but cut off from the parties and their lawyers
-- a virtual judge, practically invisible. He was not
describing a ratings hit or a show that critics would
praise.

That may describe the days of some federal trial
judges, but it does not describe their fate. It is
not the immutable destiny of judges that they must
vanish from sight and sound. It is certainly not the
case that in order to assume the role of active case
manager a judge must retreat into his or her chambers
never to be seen again. Properly understood, active
case management creates opportunities for judges to
reconnect with the litigating public. Throughout the

## II. BACKGROUND

On September 8, 2011, the Securities and Exchange

Commission (the "SEC") brought this civil complaint against

EagleEye Asset Management, LLC ("EagleEye") and Jeffrey A.

Liskov ("Liskov").[3]  Compl., ECF No. 1.  The SEC alleged that

Liskov violated section 10(b) of the Securities Exchange Act of

1934 ("section 10(b)" of the "Exchange Act"), 15 U.S.C.

§ 78j(b), and rule 10b-5 thereunder ("rule 10b-5"), 17 C.F.R. §

---

pretrial    process,    judges    can    conduct    "live"
proceedings in which they do not vanish but instead
reappear.  And as an added bonus, we think judges who
manage   their   cases   well   will   have   yet   another
opportunity   to   reappear:   at   the   trials   they   can
sometimes foster by avoiding the crippling costs that
drive parties who would like to go to trial to settle
instead.  That's a reality we'd like to see.

Steven S. Gensler & Lee H. Rosenthal, The Reappearing
Judge, 61 U. Kan. L. Rev. 849, 874-75 (2013) (citing D.
Brock Hornby, The Business of the U.S. District Courts, 10
Green Bag 2d 453, 463 (2010)).  See D. Nev. Short Tr.
Rules, available at
http://www.nvd.uscourts.gov/Files/USDC%20Short%20Trial%20Ru
les.pdf; Stephen D. Susman & Thomas M. Melsheimer, Trial by
Agreement: How Trial Lawyers Hold the Key to Improving Jury
Trials in Civil Cases, 32 Rev. Litig. 431 (2013).

[2] See In re ClassicStar Mare Lease Litig., No. 12-5467, 12-
5475, 2013 WL 3746220, at *8-11 (6th Cir. July 18, 2013),
discussed infra at n.9.

[3] While the corporation, EagleEye, is legally distinct from
Liskov, Liskov was its only officer, manager, and employee.  See
Compl. ¶ 13, ECF No. 1; Answer Defs. ¶ 13, ECF No. 7.  As such,
all acts performed by the corporation were in reality carried
out by its sole officer, Liskov.  To simplify things, this
memorandum will attribute all actions to Liskov because
distinguishing actions he performed as an officer is
unnecessary.

240.10b-5, that he violated sections 206(1) and 206(2) of the
Investment Advisers Act ("section 206(1)" and "section 206(2)"
of the "Advisers Act"), 15 U.S.C. §§ 80b-6(1),(2), and that he
violated Section 204 of the Advisers Act, 15 U.S.C. § 80b-4, and
Rules 204-2(a)(1)-(6) and 204-2(a)(8) thereunder, 17 C.F.R. §§
275.204-2(a)(1)-(6), (8).  See Compl. ¶¶ 63-93.  The SEC
requested that this Court permanently enjoin Liskov from
engaging in such conduct, require Liskov to disgorge ill-gotten
gains, and order him to pay a penalty.  See id. ¶¶ A-C.

On June 15, 2012, the SEC moved for summary judgment.
SEC's Mot. Summ. J., ECF No. 26; SEC's Mem. Law Supp. Mot. Summ.
J. ("SEC's Mem."), ECF No. 27; Pl. SEC's Local R. 56.1 Statement
Undisputed Material Facts ("SEC's Statement"), ECF No. 28.
Liskov opposed the motion while denying many of the SEC's
allegations.  Defs.' Br. Opp'n Pl.'s Mot. Summ. J. ("Liskov's
Opp'n"), ECF No. 45; Mot. Defs. Leave File Corrected Counter
Statement Facts Dispute, Attach., Counter Statement Defs. Liskov
& EagleEye Asset Mgm't LLC, Pursuant Local R. 56.1 (Corrected),
ECF No. 37.  The Court heard oral argument on September 19,
2012, and denied summary judgment.  Tr. Mot. Hr'g, Sept. 19,
2012, ECF No. 54.

The case proceeded to a nine-day jury trial, held between
November 5, 2012, and November 26, 2012.  Elec. Clerk's Notes,
Nov. 5, 2012, ECF No. 75; Elec. Clerk's Notes, Nov. 26, 2012,

ECF No. 110.  The jury found that Liskov had, as to various

victims, intentionally or recklessly misrepresented material

facts in violation of the Advisers Act, had fraudulently

misrepresented material facts with intent to deceive in

connection with the sale of a security, in violation of the

Exchange Act, had violated the Exchange Act by fraudulently

failing, in connection with the sale of a security, to disclose

his forex[4] trading record, and had intentionally engaged in a

scheme to defraud in connection with the sale of a security, in

violation of the Exchange Act.  See Jury Verdict, ECF No. 111.

    At the end of an oral hearing held December 11, 2012,

regarding remedies, this Court imposed an order including a

permanent injunction, disgorgement, and fines.  See Hearing Tr.

30:9-31:1, Dec. 11, 2012, ECF No. 125.  This order was

memorialized in a final judgment as to both defendants the

following day.  Final Judgment Both Defs., ECF No. 124.  This

order completed proceedings, and the case was terminated on

December 13, 2012.

    This memorandum explicates three useful and necessary

things.  First, this Court will explain its view on the use of

summary judgment and on why it denied summary judgment in this

---

[4] Forex is simply an acronym for "foreign exchange."  Forex trading is the exchange of foreign currencies, facilitated by private platforms set-up as markets for such exchanges.  Forex trading involves significant risk.  See Trial Tr., Vol. 1, 78:21-79:2, Nov. 5, 2012, ECF No. 83.

case (necessitating the nine-day trial) despite the overwhelming

evidence proffered at that stage by the SEC.   Second, the Court

wishes to alert those regulated by the Exchange Act of the most

significant implication of the jury verdict here.   Finally, it

is only fitting that the Court explain its reasoning for

selecting the final judgment imposed in this case.

**III. ANALYSIS**

> **A.   Despite Overwhelming Supporting Evidence, Summary**
> **Judgment for the SEC Was Inappropriate Where the**
> **Burden Is on the SEC to Prove Scienter or Negligence**

Summary judgment is overused across our courts.[5]   See Mark

W. Bennett, From the "No Spittin', No Cussin', and No Summary

---

[5] Federal judges frequently bemoan the time involved in wrestling with "meritless" motions for summary judgment, yet a recent study shows that of the motions for summary judgment filed in response to certain federally based employment discrimination claims disposed of by the District of Massachusetts between January 1, 2011, and December 31, 2011, 57% of them were granted in full, 29% were granted in part and denied in part, and 14% were denied entirely.   See Stephanie Mills & Jenna Zellmer, The Unique Obstacles Employment Discrimination Plaintiffs Face in Pre-Trial Motion Practice 20, 27 fig.2 (May 8, 2013) (unpublished manuscript) (on file with the Social Law Library), available at http://www.socialaw.com/slbook/judgeyoung13/Mills%20&%20Zellmer%20-%20Final%20Paper%20%282%29.pdf.   Attorneys move for summary judgment for one reason and one reason only.   In a significant number of cases, the motion works and trial is avoided.
Small wonder that, over the past eight years, the average American has seen his or her chance of serving on the nation's juries diminish by nearly a third (32.54% to be exact). Statistics maintained by the Administrative Office of the United States Courts show that the percentage likelihood of being selected for federal petit jury service has been steadily declining over the past decade.   Compare Admin. Office U.S. Courts, 2011 Annual Report of the Director: Judicial Business of

Judgment" Days of Employment Discrimination Litigation to the "Defendants' Summary Judgment Affirmed Without Comment" Days: One Judge's Four-Decade Perspective, 57 N.Y.L. Sch. L. Rev. 685, 686 (2012-2013); Arthur R. Miller, The Pretrial Rush to Judgment: Are the "Litigation Explosion," "Liability Crisis," and Efficiency Clichés Eroding Our Day in Court and Jury Trial Commitments?, 78 N.Y.U. L. Rev. 982, 1133 (2003); Patricia Wald, Summary Judgment at Sixty, 76 Tex. L. Rev. 1897, 1898 (1998) ("[S]ummary judgment has assumed a much larger role . . . than its traditional image portrays or even than the text of Rule 56 would indicate, to the point where fundamental judgments about the value of trials and especially trials by jury may be at stake."); see also Suja A. Thomas, Why Summary Judgment Is Unconstitutional, 93 Va. L. Rev. 139, 139-40 (2007). But see Edward Brunet, Summary Judgment Is Constitutional, 93 Iowa L. Rev. 1625 (2008).  Summary judgment is appropriate only where the materials in the record show that there is "no genuine

---

the United States Courts 326 tbl.J-2 (2012), available at http://www.uscourts.gov/uscourts/Statistics/JudicialBusiness/2011/JudicialBusiness2011.pdf with Admin. Office U.S. Courts, 2004 Annual Report of the Director: Judicial Business of the United States Courts 325 tbl.J-2 (2005), available at http://www.uscourts.gov/uscourts/Statistics/JudicialBusiness/2004/appendices/j2.pdf.  This Court calculated an average American's chance of serving on a federal petit jury by taking the number of individuals who gave jury service, and dividing that number by the number of individuals in the United States who are over the age of eighteen.  The former number was gleaned from the Administrative Conference reports cited above, the latter from the Census Bureau.

dispute as to any material fact". Fed. R. Civ. P. 56(a).  When ruling on a summary judgment motion, the trial court must view the evidence in the light most favorable to the nonmoving party and draw all reasonable inferences in favor of the nonmoving party.  Pineda v. Toomey, 533 F.3d 50, 53 (1st Cir. 2008).  If there is a sufficient evidentiary basis on which the trier of fact could find for the nonmoving party, then a genuine issue of fact exists.  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247-248 (1985).  The measure of materiality is whether the "material" fact will affect the outcome of the case under the applicable law.  See id. at 248.  The burden is on the moving party to show that no genuine issue of material fact exists. See Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986).

Because our justice system leaves credibility determinations for a jury, not a judge, see Anderson, 477 U.S. at 255, when reviewing the record, the court "must disregard all evidence favorable to the moving party that the jury is not required to believe."  Reeves v. Sanderson Plumbing Prods., Inc., 530 U.S. 133, 151 (2000).  Courts may base grants of summary judgment only on facts admitted by both parties and must disregard all evidence, even if unopposed, which the jury is free to reject.  Courts cannot grant summary judgment on an issue on which the moving party bears the burden if the moving

party relies on evidence that the jury could disbelieve even where the nonmoving party has presented no contrary evidence.[6]

This Court adheres meticulously to the standard set forth in Reeves, where the Supreme Court reviewed the Fifth Circuit's reversal of a jury verdict in an age discrimination case. Id. at 139-140. That "case consist[ed] exclusively of a prima facie case of discrimination and sufficient evidence for the trier of fact to disbelieve the defendant's legitimate, nondiscriminatory explanation for its action." Id. at 137. A jury, disbelieving the defendant's explanation for the termination, found it liable. See id. at 138-39.

While Reeves focused on the standard for judgment as matter of law, the Supreme Court made clear that it was basing its decision on the standard for granting summary judgment. See id. at 150 (noting that "the standard for granting summary judgment 'mirrors' the standard for judgment as a matter of law, such

---

[6] This Court acknowledges the apparent tension between the Supreme Court's reasoning in Reeves and Federal Rule of Civil Procedure 56(e), which provides that "[i]f a party fails to properly support an assertion of fact or fails to properly address another party's assertion of fact . . ., the court may . . . . grant summary judgment if the motion and supporting materials -- including the facts considered undisputed -- show that the movant is entitled to it." Fed. R. Civ. P. 56(e)(3). Yet this ostensible inconsistency can be squared by the presence of the word "may" in Rule 56(e) -- reserving to courts some measure of discretion in the resolution of summary judgment motions -- and by the rule's strict requirement that the movant actually be entitled to such relief -- a requirement that cannot be met under Reeves where the movant bears the burden of proof.

that 'the inquiry under each is the same.'" (quoting Anderson, 477 U.S. at 250-51)).

Where differences between these two standards occur, the standard for granting summary judgment is more exacting than the standard for granting judgment as matter of law.  After all, judgment as matter of law comes after a trial allowing the impeachment of evidence while nonmoving parties do not have the full ability to impeach testimony before the summary judgment stage.  See Celotex, 477 U.S. at 324 ("We do not mean that the nonmoving party must produce evidence in a form that would be admissible at trial in order to avoid summary judgment.").  Thus, while in Reeves the Supreme Court stated that courts should credit "evidence supporting the moving party that is uncontradicted and unimpeached, at least to the extent that that evidence comes from disinterested witnesses," 530 U.S. at 151 (internal quotation marks omitted) (quoting 9A C. Wright & A. Miller, Federal Practice and Procedure § 2529, p. 300 (2d ed. 1995)), at summary judgment, courts must ignore even uncontradicted evidence from disinterested witnesses where there is some question whether this evidence may be impeached.

In the present case, the SEC moved for offensive summary judgment.  Thus, the burden of proof for all elements of all claims was on the SEC.

Claims under section 10(b) and rule 10b-5 have six elements: (1) a material misrepresentation or omission; (2) scienter; (3) a connection with the purchase or sale of a security; (4) reliance by investors; (5) economic loss; and (6) loss causation.  Mississippi Pub. Emps.' Ret. Sys. v. Bos. Scientific Corp., 649 F.3d 5, 20 (1st Cir. 2011); see also Crowell v. Ionics, Inc., 343 F. Supp. 2d 1, 12 (D. Mass. 2004) (quoting In re Boston Tech., Inc. Sec. Litig., 8 F. Supp. 2d 43, 52 (D. Mass. 1998) (Lasker, J.)) (providing five elements by combining "economic loss" and "loss causation" into a single "resultant injury" element).

Section 206 of the Advisers Act establishes fiduciary duties owed by investment advisers to their clients. Transamerica Mortg. Advisors, Inc. v. Lewis, 444 U.S. 11, 17 (1979).  The Act makes it:

> unlawful for any investment adviser, by use of the mails or any means or instrumentality of interstate commerce, directly or indirectly- (1) to employ any device, scheme, or artifice to defraud any client or prospective client; (2) to engage in any transaction, practice, or course of business which operates as a fraud or deceit upon any client or prospective client.

15 U.S.C. §§ 80b-6(1), (2).  The differing language in section 206(1) -- "to employ" -- as compared to section 206(2) -- "to engage" -- is reflected in the varying intentionality required -- scienter is required under section 206(1) while merely negligent conduct can violate section 206(2).  See Steadman v.

SEC, 603 F.2d 1126, 1134 (5th Cir. 1979), aff'd, 450 U.S. 91
(1981) (discussing and citing SEC v. Capital Gains Research
Bureau, Inc., 375 U.S. 180, 195 (1963)).

Thus, to prove any of its central claims[7] under either the
Exchange Act or the Advisers Act, the SEC had to prove either
the requisite scienter or a breach of a duty sufficient for a
finding of negligence.  Both of these are questions best left to
a jury.

The necessary scienter is a mental state "embracing [an]
intent to deceive, manipulate, or defraud." Ernst & Ernst v.
Hochfelder, 425 U.S. 185, 193 n.12 (1976).  To prove scienter, a
plaintiff must show "either a conscious intent to defraud or a
high degree of recklessness." SEC v. Ficken, 546 F.3d 45, 47
(1st Cir. 2008) (internal quotation marks omitted) (quoting ACA
Fin. Guar. Corp. v. Advest, Inc., 512 F.3d 46, 58 (1st Cir.
2008)).

In attempting to demonstrate the requisite scienter, the
SEC relied primarily on Liskov's deposition and documentary
evidence.  See SEC's Mem. 11-14.  The SEC's evidence was

---

[7] The SEC also claimed that Liskov violated Section 204 of
the Advisers Act, 15 U.S.C. § 80b-4, and Rules 204-2(a)(1)-(6)
and 204-2(a)(8), thereunder, 17 C.F.R. §§ 275.204-2(a)(1)-(6),
(8).  See Compl. ¶¶ 82-93.  This claim regards violation of
reporting requirements as an investment adviser.  Such claim did
not appear to be important to either the SEC or Liskov.  As
such, it was not even presented to the jury and is not of much
moment for this analysis.

certainly strong.  It had documents forged by Liskov that
authorized money transfers among his clients' accounts.  See Id.
at 11; SEC's ¶ Statement 231; Id., Ex. 1, Def. Jeffrey Liskov
Respons Pl. Sec. & Exch. Comm. First Set Req. Admis. ("Liskov
Admis.") 10-11, ECF No. 28-1.  These money transfers appeared to
be attempts by Liskov to cover his trading losses.  Liskov
appeared to mislead his clients regarding the losses.  Moreover,
Liskov admitted that he used white-out to create the altered
documents, that he did not have specific authorization from the
victims to make the transfers, and that he was sloppy.  See
Liskov Admis. at 3-6.

Liskov claimed that while he did not have specific
authorization, he did have general permission from the victims
to transfer money among their accounts and that his doing so
through altered documents, while sloppy, was not intended to
defraud.  See Liskov's Opp'n 11-12.  As such, Liskov admitted to
the acts, but denied the requisite scienter.

The SEC argued that no reasonable jury could look at what
Liskov had admitted -- the repeated use of white-out to transfer
money without authorization along with misleading statements
about the success of investments -- and conclude anything but
that Liskov intended to defraud the victims.  See SEC's Mem. 11-
2; Tr. Mot. Hr'g 3:23-25.

This Court disagreed and continues to do so.  Liskov did not admit to the requisite scienter.  Such a scienter is up to the jury to infer.  The evidence points in that direction, but the jury is free to disbelieve the victims (who are certainly not disinterested witnesses) and believe that Liskov indeed had general authorization to transfer client funds as he saw fit.  Perhaps doing so through whiting-out and altering documents was more than clumsy (and a violation of fiduciary duties), but it may not have been the requisite scienter for finding a violation of section 10(b) of the Exchange Act, rule 10b-5, or section 206(1) of the Advisers Act.

Interestingly, after it became clear that this Court would not grant summary judgment as to any counts requiring scienter, see Tr. Mot. Hr'g 3:21-22 ("as to those [counts] that require scienter[,] [Liskov is] entitled to a trial on that, isn't he?", the Court asked); see also id. at 5:8 ("On scienter I have real problems", the Court observed), the SEC argued that the Court should find a violation of section 206(2) of the Advisers Act because only negligence must be shown, id. at 7:17-21.  The SEC argued that Liskov admitted to negligence by virtue of admitting that he was sloppy, unwise, and took shortcuts.  See id. at 7:24-8:7.  This Court disagreed, pointing out that whether negligence has occurred must be a question for a jury.  Id. at 7:22-23.

In the end, the jury found that Liskov did not "make negligent misrepresentations of material fact in violation of the Investment Advisers Act."  See Jury Verdict 1.a.  One could speculate that the jury, quite reasonably, rejected Liskov's testimony that he was merely sloppy, finding instead that he had acted intentionally.  Had this Court granted summary judgment for the SEC on the negligence counts, it would have made a grave mistake, as the jury reasonably concluded no negligence occurred in this case.

Similarly, this Court would have been incorrect to have granted summary judgment on the counts requiring scienter.  A jury reasonably could have concluded that Liskov did not intend to defraud his clients, but, while having no intent to defraud, was extremely sloppy, took shortcuts by altering old documents rather than getting new authorizations from clients, and violated a slew of fiduciary duties.  Few things seem more appropriately the province of a jury than the inference of a defendant's mental state.  Without admissions by a defendant that he intended to defraud, it is hard to imagine a situation in which a court can grant offensive summary judgment where such scienter is a required element.  But see SEC v. Druffner, 517 F. Supp. 2d 502, 509 (D. Mass. 2007) (Gorton, J.)(granting summary judgment for the SEC in a case requiring scienter by determining that the circumstantial evidence of scienter is "sufficiently

potent to establish fraudulent intent beyond hope of
contradiction") (quotation mark omitted) (quoting In re
Varrasso, 37 F.3d 760, 764 (1st Cir. 1994)), aff'd sub nom. SEC
v. Ficken, 546 F.3d 45 (1st Cir. 2008).

Too often, judges substitute their own judgment for that of
the jury. These judges decide that no reasonable juror could
view the evidence in a manner different from the judge's own
conclusion.[8] This cognitive illiberalism has been rightly
condemned as a form of judicial arrogance. See Dan M. Kahan et
al., Whose Eyes Are You Going to Believe? Scott v. Harris and
the Perils of Cognitive Illiberalism, 122 Harv. L. Rev. 837,
896-99 (2009).

Juries have not only the duty, but also the right to decide
cases. Encroaching upon the province of juries to decide
questions of fact, such as the determination of a defendant's
state of mind, violates not only the constitutional rights of
the parties in a suit, but also the constitutional rights of the
jurors themselves.[9] See Andrew Guthrie Ferguson, The Jury as

---

[8]I am myself guilty of this institutional (and
unconstitutional) hubris. Sensing v. Outback Steakhouse of
Fla., Inc., 566 F. Supp. 2d 24 (D. Mass. 2008), rev'd 575 F.3d
145 (1st Cir. 2009).

[9] Contra In re ClassicStar Mare Lease Litig., 2013 WL
3746220, the mirror image of this case -- in everything but the
result. There too the plaintiff -- which bore the burden of
proof -- brought a strong motion for summary judgment. There too
"[t]he defendants failed to call their knowledge into dispute

Constitutional Identity, U.C. Davis L. Rev. (forthcoming)
(manuscript at 4), available at
http://ssrn.com/abstract=2222158.

### B. Failing to Disclose One's Forex Trading Record Can Be a Violation of the Exchange Act

Throughout these proceedings, the SEC was determined to argue that Liskov should have disclosed his track record in forex trading.  See, e.g., SEC's Mem. 10.  The SEC contended that such a disclosure was material because Liskov had previously lost thousands of his own dollars and much more in client funds in trading in forex and that future clients would not have invested with Liskov in forex had they known of these losses.  See id.

Liskov disagreed.  He argued that his training as a broker-dealer for Fidelity Brokerage Services had taught him not to disclose his personal trading track record.  Liskov's Opp'n 19.  Moreover, the SEC had considered precisely such a rule -- requiring brokers to disclose their track records -- but had rejected it.  As such, Liskov argued that as matter of law, he

---

with affidavits, and there is no other evidence to support the defendants' version of events." Id. at 22 (Merritt, J., concurring in part and dissenting in part).  "On the question of damages, in particular, the [district] court simply accepted the plaintiffs' theory of the case because it saves time to avoid a trial." Id.  The result? Summary judgment for the plaintiff in the amount of $65,000,000 affirmed 2-1.  See Id. at 1.  Neither opinion cites Reeves or acknowledges its teaching.  Perhaps I am missing something.

had no duty to disclose the losses he suffered in the past to future customers.  Id. at 19-20.

Having repeatedly heard these arguments, this Court was frustrated by both parties' imprecision.  The question of "duty" is indeed matter of law.  See Fernandes v. AGAR Supply Co., Inc., 687 F.3d 39, 42 (1st Cir. 2012) ("The existence of a legal duty is a question of law appropriate for resolution by summary judgment." (quoting Afarian v. Mass. Elec. Co., 449 Mass. 257, 261 (2007))).  There is no doubt in this case that Liskov had a fiduciary duty to his clients.  The scope of that duty, however, is a question of what a reasonable broker-dealer fiduciary in the position of Liskov would do.  As with most questions of reasonableness, it is up to the jury to determine whether Liskov breached his fiduciary duties by failing to inform his clients of his track record in forex.  The proper standard of care is for a jury to decide.  Nor is the jury bound by the SEC's indecision or the standards and practices of the securities industry.  Those considerations bring to mind the case of The T.J. Hooper, 60 F.2d 737 (2d Cir. 1932), which every first-year law student ought study in torts.  In that case, two barges towed by two tugboats were lost in a storm.  Id. at 737.  The trial judge found that the tugboats were unseaworthy because they failed to have radios which would have alerted them to the storm and possibly led them to seek shelter and avoid the loss

of the barges.  Id.  Judge Learned Hand, writing for the panel,
ruled that even though it was not the common practice of tugs to
carry radio receiving sets,[10] failure to carry receiving sets
could be, and in this case was, properly found to be a breach of
the tugs' owners' duty to safeguard the barges and cargo.  See
id. at 740.  He famously reasoned:

> Indeed in most cases reasonable prudence is in fact
> common prudence; but strictly it is never its measure;
> a whole calling may have unduly lagged in the adoption
> of new and available devices.  It never may set its
> own tests, however persuasive be its usages.  Courts
> must in the end say what is required; there are
> precautions so imperative that even their universal
> disregard will not excuse their omission.

Id.[11]  While Liskov may claim that he was trained not to disclose
his track record, while he may assert that not discussing one's
track record is an industry practice, and while he may even
point to the lack of a rule adopted by the SEC to require
disclosing one's track record, none of these declarations
absolve him of his duty or ensure that he has satisfied that
duty.  Judge Hand spoke of courts declaring what is required
while reviewing a judge's finding in an admiralty case, id., but
it is typically juries who determine the standard of proper

---

[10] There was also no law requiring tugs to carry radio
receiving sets.  Id. at 740.

[11] I have a personal partiality to the case of The T.J.
Hooper. Charlie Bolster, my old friend and colleague on the
Massachusetts Superior Court, represented the interests of the
owners of the barges' cargo.

diligence, see Texas & P. Ry. Co. v. Behymer, 189 U.S. 468, 470 (1903) (Holmes, J.) (holding that a jury may find that compliance with industry practices violates a standard of "reasonable prudence").

For these reasons, this Court put the question to the jury: "Did Mr. Liskov violate the Securities Exchange Act of 1934 by fraudulently failing, in connection with the sale of a security, to disclose his forex trading record to [his clients]?"  Jury Verdict, Question 3.b.  The jury answered in the affirmative as to four clients.  Id.  The jury was convinced that by failing to disclose his forex track record, Liskov had acted fraudulently, violating his fiduciary duties to clients and the Exchange Act.

The American jury makes a profound contribution to the very structure and fabric of American law, Ciulla v. Rigny, 89 F. Supp. 2d 97, 98 (D. Mass. 2000), and so it is here.  Indeed, this particular case would be of little interest to anyone other than the litigants were it not for the remarkable role of the American jury.  According to this federal jury, a broker-dealer who fails to disclose his poor forex trading record to clients, where knowledge of such a record may influence whether they choose to invest in forex with him managing that investment, violates his fiduciary duties and the Exchange Act.  Since this jury determined that a broker-dealer who fraudulently has failed to disclose his poor forex trading record has violated the

Exchange Act, other broker-dealers should now be on notice that such a failure by them could lead to the same finding.  This important jury finding is as much "the law" as it would be were this Court to have made the same finding in a jury-waived case. No longer can the securities industry simply advance the SEC's equivocation or its own internal procedures as the standard against which its conduct should be measured. Why? An American jury has said so.[12]

### C.   Sanction is justified

Along with the jury's verdict that Liskov violated section 206(1) of the Advisers Act, section 10(b) of the Exchange Act, and rule 10b-5, thereunder, the Court ruled that Liskov violated Section 204 of the Advisers Act, 15 U.S.C. § 80b-4, and Rules

---

[12] Ironically, were I to have reached this same conclusion as a judge, my opinion would rapidly find its way into electronic databases that are fully word searchable. Why? Because we are eager to trace how the "law" is developing. A jury verdict, on the other hand, is archived only on "pathetic PACER", Enwonwu v. Chertoff, 376 F. Supp. 2d 42, 82 n.34 (D. Mass. 2005) (quoting Letter from Hon. William G. Young to Hon. John W. Lungstrum (June 9, 2005)) (internal quotation marks omitted), the federal courts' virtually unsearchable and thus impenetrable internal database. This is but another example how we in the judiciary ourselves institutionally marginalize our constitutional partners in adjudication. Jurors are as much constitutional officers as are we, U.S. Const., art. III, § 2, cl. 3 (criminal cases), id., Amend. VII (civil cases). Indeed, when applying the law to the facts they have found, jurors are supreme. Their verdicts are an even more important indicia of legal development as they come from the people themselves, a transparent expression of direct democracy.

I wrote this opinion primarily to rescue this important jury verdict from oblivion.  This ought not be necessary.

204-2(a)(6) and 204-2(a)(8) promulgated thereunder, 17 C.F.R

§§ 275.204-2(a)(1)-(6), (8), concerning a registered investment

adviser's obligations to keep true, accurate, and current books

and records, see Final Judgment Both Defs. 1.[13]

This Court imposed sanctions reflective of the relief the

SEC sought.  The Court permanently enjoined Liskov and his

agents from violating the recordkeeping requirements of the

Advisers Act, section 10(b) of the Exchange Act, and Rule 10b-5

promulgated thereunder, and sections 206(1) and (2) of the

Advisers Act.  See id. at 1-2.  The Court also ordered

disgorgement of ill-gotten profits.  See id. at 2.  The SEC

proved that the ill-gotten profits based on only those victims

as to whom Liskov was found liable[14] totaled $301,502.26.  The

Court also ordered Liskov to pay prejudgment interest in the

amount of $29,603.59 as authorized by statute to prevent a form

of unjust enrichment in Liskov possessing for a significant

period of time these ill-gotten gains without paying the

requisite interest.  See Hearing Tr. 9:10-10:9, Dec. 11, 2012,

ECF No. 125; Final Judgment Both Defs. 2.

---

[13] The parties had agreed to submit this last count of the
SEC's complaint to the Court rather than to the jury.

[14] Liskov was found not liable as to his dealings with
Stephen Bodi, see Jury Verdict, and the disgorgement fees sought
by the SEC properly excluded any funds Liskov earned as a result
of his work for Stephen Bodi, see Hearing Tr. 9:6-8, Dec. 11,
2012, ECF No. 125.

Finally, the Court ordered a civil penalty: "EagleEye and Liskov are _severally_ liable for civil penalties in the amount of $725,000 _each_ pursuant to Section 21(d)(3) of the Exchange Act, 15 U.S.C. § 78u(d)(3), and Section 209(e) of the Advisers Act, 15 U.S.C. § 77t(d); 15 U.S.C. § 78u(d)(3); 15 U.S.C. § 80b-9(e)." Final Judgment Both Defs. 3. The Court deemed this an appropriate civil penalty for a host of reasons.

This penalty properly reflects the seriousness of the offense. Here, Liskov repeatedly transferred client funds without their authorization. He used white-out to alter documents. He used these forged documents to transfer vast sums of client money from other investments into a highly speculative market that he was quite literally addicted to playing -- the way a gambler may be addicted to playing craps. These actions, according to the jury, were part of an _intentional_ scheme to defraud four of his clients. The clients, particularly, Patricia Stott and Judith Starrett, lost significant sums of money as a result, with losses for all victims totaling in the millions of dollars.

Moreover, Liskov's conduct clearly violated multiple fiduciary duties. Liskov had a duty to protect, advise, and guide his clients, helping them avoid the pitfalls of investing. Instead, he defrauded them to fuel his own obsession with forex

trading, and, as a result, he lost significant sums of his clients' funds.

The Court has also taken into account Liskov's present inability to pay and the impact such a civil penalty will have on him and his family; still, a significant penalty is appropriate due to the seriousness of the conduct at issue.

The SEC requested a civil penalty of $725,000 against EagleEye and $840,000 against Liskov.  See SEC's Post Trial Br. 1-2, ECF No. 119.  This Court views the conduct of one and the other as equivalent because there is no way to distinguish the individual persona from the corporate one.  As such, the interests of justice demand that the penalty be identical for both the corporate body and the individual.  Thus, the $725,000 civil penalties assessed severally against each Liskov and EagleEye properly reflect the seriousness of the conduct, the mitigating factors, and the interests of justice.

**IV. CONCLUSION**

For the foregoing reasons, this Court denied the motion for summary judgment on September 19, 2012, ECF No. 51, and, on December 12, 2012, imposed its final order, ECF No. 124.

/s/ William G. Young
WILLIAM G. YOUNG
DISTRICT JUDGE